Benjamin Konop
OH Bar # 0073458
Kristina Betts
AZ Bar # 024859
1700 G Street, NW
Washington, DC 20552
(202) 435-7265
(312) 610-8962
Benjamin.konop@cfpb.gov
Kristina.betts@cfpb.gov
Bureau of Consumer Financial Protection

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| Bureau of Consumer Financial Protection, | Case Number |
| Plaintiff, | |
| v. | |
| Village Capital & Investment LLC, | COMPLAINT |
| Defendant. | |

The Bureau of Consumer Financial Protection (Bureau) brings this action against Village Capital & Investment LLC (Village Capital or the Company) under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564, 5565, and alleges as follows.

**Jurisdiction and Venue**

1.  This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal

1

question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

2. Venue is proper because the Company resides and transacts business in this district. 12 U.S.C. § 5564(f).

**Parties**

3. The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority and is authorized to initiate civil actions in federal district court to secure appropriate relief for violations of "Federal consumer financial law," 12 U.S.C. § 5564(a)-(b), including the CFPA, 12 U.S.C. § 5481(14).

4. Village Capital is a non-bank mortgage company headquartered in Henderson, Nevada. At all times material to this Complaint, the Company transacted business in this district and elsewhere. The Company extends credit to consumers and is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(5)-(7), (15)(A)(i).

**Factual Background**

5. Village Capital offers a product known as an Interest Rate Reduction Refinancing Loan (IRRRL), which allows veterans, with a loan guaranteed by the Department of Veterans Affairs, to refinance their mortgages at lower interest rates.

6. The Company has roughly 100 employees and ten branches in ten states, including San Antonio, Texas. Its loan portfolio consists of about 28,000 mortgages.

7. Village Capital markets its products to potential customers primarily through phone calls and direct mail.

8. The Company's loan officers are responsible for taking calls from potential customers and talking customers through the loan process, from filling out the application through closing.

9. In March 2017, Village Capital hired a team of loan officers to staff a new office in San Antonio, Texas, with the primary responsibility of generating loans through in-home visits to veterans.

10. Between March 2017 and August 2018, the San Antonio office employed five loan officers responsible for in-home sales presentations to veterans to induce them to refinance their loans with the Company.

11. The San Antonio office primarily received leads for potential consumers from the Company's corporate office.

12. Loan officers were provided with preset in-home appointments with veterans, a computer, a PowerPoint presentation, an Excel spreadsheet, a corresponding laminated worksheet, and a script for use at the in-home sales presentations.

13. Village Capital's San Antonio office designed the Excel spreadsheets for the loan officers to generate the financial data illustrating the supposed benefits of refinancing. The corresponding worksheet was the consumer-facing document designed to show the consumer the benefits of refinancing.

14. Loan officers were instructed to go over the PowerPoint presentation with the consumer, introducing Village Capital and its loan products. After the presentation, loan officers were to ask the consumers for their current mortgage documents and begin the sales pitch using the laminated worksheet.

15. Loan officers were instructed to fold the worksheet in half; the top of the worksheet states "Here's what most banks don't want you to know. . . ." Loan officers were instructed to write the consumers' current mortgage details (e.g., interest rate, taxes, insurance, total house payment) on the worksheet and to read consumers the language printed on the worksheet, stating, "I want to show you a benefit that is going to put you and your family in a <u>much better</u> financial situation. The Veterans Administration designed a benefit which was approved by the U.S. Congress to Honor Americas Veterans. *Let me show you how it works. . . .*"

16. Loan officers were trained to then flip the worksheet and begin using the Excel spreadsheet to "compare apples to apples" the consumer's current loan and the refinanced loan.

17. Using the consumers' current mortgage details, loan officers would then enter those numbers into the Excel spreadsheet and walk consumers through a comparison of their current mortgage and the new mortgage at 38 months, 4 years, 5 years, and 20 years. The bottom of the worksheet states "Obviously, our worst case scenario is <u>MUCH BETTER</u> than your best case scenario, isn't it?"

18. Loan officers were trained to flip the worksheet again to the last page and write the numbers derived from the Excel spreadsheet onto the worksheet with a dry erase marker. The loan officers would then use the worksheet to go over the "immediate benefits" of the program, including the "total monthly benefit" and the fees.

19. After the presentation, loan officers would wipe the laminated worksheet clean so that it could be used for the next presentation.

20. The formulas in the Excel spreadsheets loan officers used during in-home presentations to calculate the "apples to apples" comparison between consumers' mortgages and the IRRRL were flawed. Because the flawed formulas produced inaccurate results, the figures used in the worksheets and quoted to consumers were misleading.

21. Specifically, the Excel spreadsheets, and therefore the worksheets presented to consumers, were deceptive because they misrepresented the cost savings to the consumer of the refinanced loan by: (1) inflating the future amount of principal owed under the existing mortgage by underestimating the proportion of the consumer's existing monthly payment that is applied to principal; (2) underestimating the future amount of the refinanced mortgage's monthly payments by overestimating the loan's term; and (3) overestimating the total monthly benefit of the loan after the first month.

## Count I

### Deceptive Acts or Practices, in Violation of the CFPA

22. The allegations in paragraphs 1 to 21 are incorporated here by reference.

23. An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.

24. Information that is material to consumers is information that is important and is likely to affect a consumer's choice of, or conduct regarding, the product or service.

25. During in-home presentations, Village Capital's loan officers misrepresented the benefit to the consumer of refinancing. This information is material and would likely affect a consumer's decision to refinance with Village Capital.

26. Therefore, Village Capital engaged in deceptive acts and practices in violation of the CFPA. 12 U.S.C. § 5536(a)(1)(B).

5

**Prayer for Relief**

Wherefore, the Bureau requests that the Court:

1. permanently enjoin Village Capital from committing future violations of the CFPA, or any provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);
2. grant additional injunctive relief as the Court may deem just and proper;
3. award damages or other monetary relief against Village Capital;
4. order Village Capital to pay redress to consumers harmed by its unlawful conduct;
5. order Village Capital to disgorge all ill-gotten gains;
6. impose on Village Capital a civil money penalty;
7. order Village Capital to pay the Bureau's costs incurred in connection with prosecuting this action; and
8. award additional relief as the Court may determine to be just and proper.

Respectfully submitted,

Kristen A. Donoghue
*Enforcement Director*
Jeffrey Paul Ehrlich
*Deputy Enforcement Director*
Kara K. Miller
*Assistant Litigation Deputy*

/s/Benjamin Konop
Benjamin Konop (OH Bar # 0073458)
    Telephone: (202) 435-7265
    E-mail: benjamin.konop@cfpb.gov

Kristina D. Betts (AZ Bar # 024859)
    Telephone: (312) 610-8962
    E-mail: kristina.betts@cfpb.gov
*Enforcement Attorneys*
Bureau of Consumer Financial Protection
1700 G Street, NW

Washington, DC 20552
Facsimile: (202) 435-7329
*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

**Certificate of Service**

I HEREBY CERTIFY that on December 4, 2018, I served a true and correct copy of the foregoing Complaint on the following counsel for Defendant via electronic mail:

>David Shirk
>LotsteinLegal, PLLC
>5185 MacArthur Blvd, NW, Suite 800
>Washington, DC 20016-3341
>Phone: (202) 400.3870
>Email: shirk@lotsteinlegal.com

/s/Benjamin Konop
Benjamin Konop
*Attorney for Plaintiff*
*Bureau of Consumer Financial Protection*